UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-20140-CR-ALTMAN

UNITED STATES OF AMERICA

v.

EHIS LAWRENCE AKHIMIE,
    a/k/a "Lawrenchi,"

                      **Defendant.**
_____/

## SENTENCING MEMORANDUM

The government submits this sentencing memorandum for defendant Ehis Lawrence Akhimie, aka "Lawrenchi" ("Akhimie"), who is scheduled to be sentenced on September 11, 2025. Akhimie is the second defendant in this matter to stand before the Court for sentencing. Akhimie pleaded guilty to conspiracy to commit mail and wire fraud in connection with a multi-year inheritance fraud scheme that stole millions of dollars from hundreds of vulnerable adults. Six of Akhimie's co-conspirators were sentenced previously in *United States v. Ezennia Peter Neboh*, et. al, Case No 1:22-cr-20134-WILLIAMS, and one additional defendant has been sentenced by this Court. For the reasons discussed below, the government recommends that the Court sentence Akhimie to 97 months of incarceration, which is the low end of the applicable Guidelines range. The government submits that such a sentence would be a just result that is sufficient, but not greater than necessary, and appropriately accounts for the factors set forth in 18 U.S.C. § 3553(a). The court should also order the defendant to pay $6,860,784.11 in restitution to his 411 victims in the amounts specified in the addendum to the presentence investigation report.

**FACTUAL BACKGROUND**

Defendant Akhimie admitted to these facts in support of his guilty plea:

Ehis Lawrence Akhimie, and his co-defendants, the co-defendants in Case No. 1:22-cr-20134 (Ezennia Peter Neboh, Emmanuel Samuel, Jonathan Abraham, Kennedy Ikponmwosa, Jerry Chucks Ozor, and Amos Prince Okey Ezemma),[1] and others (collectively, "his co-conspirators") operated an inheritance fraud scheme to steal money from elderly and otherwise vulnerable Americans. Beginning in at least May 2017 and continuing through his May 2024 arrest, Akhimie and his co-conspirators engaged in a scheme to defraud by mailing hundreds of thousands of letters to elderly or otherwise vulnerable Americans, among others. The letters falsely represented that the recipients were entitled to receive an inheritance from a long-deceased family member, or from an attorney representing an elderly woman dying in an overseas nursing home. Throughout the course of the scheme, more than 400 victims in the United States were fraudulently convinced to send more than six million U.S. dollars in advance fees for, among other things, costs to deliver the inheritance funds, purported taxes, and various bogus certificates, before they could receive their alleged inheritances.

During the conspiracy, Akhimie resided in the United Kingdom, where he was a key member of the inheritance scheme. Akhimie's role in the fraud scheme included communicating directly with victims, formatting, printing, packaging, and mailing letters to victims, and inducing victims to make advance payments in order to receive their alleged inheritance.

As part of the conspiracy, Akhimie and his co-conspirators obtained the names and contact information of potential victims in the United States, including victims located in the Southern District of Florida, from a list broker, who provided lists of potential victims' contact information. The lists included many elderly U.S. consumers who were older than 65 years old. Akhimie and his co-conspirators used these lists to create personalized inheritance solicitations to send to the

---

[1] The defendants in that case participated in the same scheme until their April 2022 arrests. Mr. Akhimie and many of his co-defendants continued to participate in the scheme thereafter and were indicted subsequently.

2

potential victims in the United States as part of the conspiracy to defraud and caused those letters to be printed and mailed to these consumers in the United States.

Akhimie and his co-conspirators used fictitious aliases, such as "Sofia Gomez," "Mariana Otis," and "Mariana Alves" to pose as a manager of a bank in Spain when sending the letters. In the letters, Akhimie and his co-conspirators falsely and fraudulently informed the recipients that they were entitled to receive a $26.7 million dollar inheritance left in a Spanish bank by an individual who died in a car accident overseas and shared the recipient's last name. Using aliases, Akhimie and his co-conspirators then falsely posed as employees of the bank holding the alleged inheritance money, and purported to advise victims about how to apply for and obtain inheritance funds. The letters provided an email address, telephone, and facsimile number for the fictitious sender's husband and encouraged victims to respond to obtain their alleged inheritances.

When victims responded to these letters, Akhimie and his co-conspirators communicated with the victims via email and telephone. Akhimie and his co-conspirators then sent victims documents purporting to be from the Spanish Government's Ministry of Justice that claimed to be sworn statements and court orders certifying that the victims were the rightful heirs to a deceased individual and were entitled to inherit the decedent's money. In these communications, Akhimie and his co-conspirators used additional aliases, such as "Gerald Martinez," "Gerrard Martinez," "Manuel Ortega," and "Oscar Lozano," to pose as employees of the foreign remittance department of a Spanish bank.

After victims sent their alleged application to receive their inheritance to the fictitious bank employees, Akhimie and his co-conspirators falsely and fraudulently informed victims via email and telephone that they needed to pay an initial fee for the cost of alleged delivery fees, usually totaling thousands of dollars. When victims paid this initial fee, Akhimie and his co-conspirators

informed the victims via email, telephone, and international mail that they had to pay separate fees for taxes, anti-terrorist and money laundering certificates, and payments to avoid questioning from government authorities to receive their supposed inheritances. The advance fees escalated from a few thousand dollars to tens of thousands of dollars. In telling those and other lies, Akhimie and his co-conspirators induced many elderly victims to pay many thousands of dollars.

Throughout the conspiracy, Akhimie and his co-conspirators instructed victims to send money to couriers in the United States via check, cash, money order, or wire transfer. Often, the couriers had been previously victimized by Akhimie and his co-conspirators as part of the scheme but could no longer afford to make additional payments to obtain their alleged inheritances. Akhimie and his co-conspirators informed these victim-couriers that other individuals would send them payments to help offset the costs that they supposedly owed to receive their inheritances. Akhimie and his co-conspirators instructed these victim-couriers to deposit victims' checks and money orders, withdraw U.S. currency, tape U.S. currency into the pages of magazines, books, and other documents, and ship those items to Akhimie and his co-conspirators through various means, including directly to the co-conspirators.

As part of the conspiracy, Akhimie and his co-conspirators collected more than six million dollars from many victims, including elderly and vulnerable victims, in the United States, but victims never received their alleged inheritance funds.

## GUIDELINES CALCULATION

In the plea agreement, the parties agreed that Akhimie's Sentencing Guidelines range should be calculated, after acceptance of responsibility, at an Offense Level of 30. Plea Agreement, Dkt. No. 68 ¶¶ 7-8. The Probation Office agrees with this analysis. Draft Presentence Investigation Report, Dkt. No. 77, ¶¶ 55-68. If the Court adopts these Guidelines, given Akhimie's

4

Criminal History is within Category I, his advisory guidelines range should be calculated at 97-121 months of incarceration.

## SENTENCING FACTORS

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 552 U.S. 3849 (2007). Pursuant to 18 U.S.C. § 3553(a), the court shall impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute which include the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training. In addition, the statute requires the court to consider a number of factors in determining the appropriate sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the purposes of the statute; (3) the kinds of sentences available; (4) the sentencing guidelines; (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims.

    A.    **Nature and Circumstances of the Offense**

Akhimie participated in a scheme that defrauded hundreds of victims over the course of several years. In 2022, the scheme was interrupted by the arrest of three of Akhimie's close friends in the United Kingdom, Emmanuel Samuel, Iheanyichukwu Jonathan Abraham, and Jerry Ozor. Undeterred, Akhimie and other co-defendants in this case continued to operate the scheme through Akhimie's May 2024 arrest. The scheme was sophisticated, it spanned several years, and it was successful in robbing numerous innocent Americans of their savings and retirements. Because the fraud proceeds in this matter did not transit traditional banking channels, tracing the proceeds is challenging. But the government has traced more than $6,500,000 from more than 400 victims

5

that Akhimie and his co-conspirators stole from – vulnerable victims who were duped into sending money in advance to chase the life-altering possibility of the $26.7 million inheritance that the defendants promised them.

The evidence of Akhimie's involvement is detailed and overwhelming. Indeed, the evidence shows that Akhimie has been a long-time participant in the fraud scheme, with evidence of his involvement beginning as early as 2017 and running nearly until the day of his arrest. Throughout the scheme, Akhimie worked closely with defendants in both cases and in various countries.

Akhimie communicated with victims and induced them into sending advanced payments to receive their promised inheritance. Akhimie used email accounts and phone numbers bearing U.S. telephone numbers as well as various aliases to communicate with victims and dupe them into making payments as part of the scheme. He directed victims to make payments, sent additional letters and documents intended to persuade those same victims to make additional payments, and helped direct victim payments to various locations intended to help launder the proceeds and hide his and his co-conspirators' involvement.

The government has heard from many of the victims in this case, and those victims have described the serious financial hardship as well as lasting mental and emotional harm that the defendants inflicted upon them. For example, victim M.C.M. was a 94-year-old woman who received a letter about a $26.7 million dollar inheritance. The defendant's co-conspirators convinced M.C.M. to send $250,000 to receive her alleged inheritance. M.C.M. explained in a victim impact statement submitted to Judge Williams that her husband had just passed away and the money the defendants convinced her to send to them left her "broke." ECF No. 65, Dkt. 22-

CR-20134. She further explained that she lived in fear that she does not "know how to make it sometimes." *Id.*

The financial hardship and emotional toll described by M.C.M. is illustrative of the hardship experienced by many elderly Americans defrauded by Akhimie and his co-conspirators. As M.C.M. described: "I'm dealing with depression and despair now because I cannot communicate this fraud that I've gotten myself into to a family member or friend." *Id.* The isolation of elderly Americans after the death of a spouse, which is often coupled with the fear of being perceived as not being able to care for oneself physically or financially, is one reason why fraudsters target elderly Americans. M.C.M.'s experience reflects that the toll of these crimes was not just financial; Akhimie and his co-conspirators emotionally traumatized M.C.M. and others who should otherwise be enjoying the fruits of a lifetime of hard work and the love of their families in the sunset years of their lives. And that they did so throughout the course of the coronavirus pandemic, at a time when many individuals were living under challenging and often solitary conditions, is particularly galling.

Akhimie personally engaged in this emotional traumatization as well. For example, when victim E.H. told Akhimie in an email that she was 86 years old and that her bank was growing suspicious of her attempts to send money as part of the scheme, Akhimie (posing as "Sofia Gomez") responded,

> I understand the stress you are going through, but your bank and whoever you are sharing information with have made this even more complicating. My husband and I are true practicing Catholics and will not cheat or steal from someone else. We have both done a lot for charity and hope to do even more. It's a shame that those that do not know the details about your inheritance are the ones misleading you and mounting unnecessary pressure on you.

Of course, none of those representations were true.

7

In another 2021 email, a victim, suspicious of the provenance of the inheritance, told Akhimie (posing as "Sofia Gomez") that he wanted to withdraw his application for his inheritance. Akhimie threatened victim H.K. that the victim "will be prosecuted" for trying to withdraw a "false application" to the "High Court" to get his supposed inheritance, unless the victim continued with the transaction and "pai[d] a fine" of $8,300 and a "termination fee" of an additional $900. Akhimie later agreed to "split" those fines with the victim, who ultimately paid an additional $5,000 in response to this extortionate and outrageous threat.

The defendant's personal efforts to defraud these vulnerable victims profoundly affected their lives and should be considered by the Court in determining an appropriate sentence that reflects the need to protect vulnerable members of society, to deter others from engaging in similar fraudulent conduct, and to punish those who knowingly sought out and preyed upon elderly Americans for profit. Consequently, a sentence within the sentencing guidelines range is an appropriate punishment based on the seriousness of the defendant's offense, and the need to provide just punishment.

B.  **History and Characteristics of the Defendant**

A guidelines sentence is also appropriate in light of the history and characteristics of the defendant. Akhimie, like many of his co-conspirators, has made a career out of fraud. While others joined earlier, Akhimie was fully involved in the scheme by at least 2019, and he continued participating in the scheme for years, until his May 2024 arrest. Notably, Akhimie continued to scam elderly and vulnerable Americans through the April 2022 arrests of five co-defendants, including three of his close friends in the U.K., and continued for another two years until his own arrest in May 2024.

Akhimie faces sentencing at the same advisory sentencing guidelines range as Mr. Ogbata, who the Court sentenced to 97 months earlier this year. While there are aspects of Akhimie's

8

involvement which differentiate him from Ogbata's, they are sufficiently similarly situated such that Akhimie should receive the same sentence as Ogbata did. It bears emphasizing again that both Ogbata and Akhimie continued participating in the scheme after watching their friends be arrested, extradited, convicted, and sentenced for this very conduct.

Akhimie, having followed closely the case before Judge Williams, was not deterred by the very real potential of consequences for his own criminal conduct. To the contrary, the defendant knowingly participated in the scheme from the United Kingdom for two years following his co-conspirators' arrests, as he watched them be extradited, convicted, and sentenced to serious terms of incarceration. Evidence from the phone seized from Akhimie on the day of his arrest reflects that Akhimie and his co-defendants were well-aware of those arrests and closely followed the details of the prosecution of their friends, including, for example, by sharing press releases or news articles tracking the sentences issued by Judge Williams.

Though Akhimie deserves credit for his timely acceptance of responsibility by promptly pleading guilty, he knowingly participated in a fraud scheme for several years, including for more than two years after these related arrests, and his decision to continue to commit egregious crimes in the face of the prosecution of his friends reflects the seriousness of his crimes, the history and characteristics of the defendant, and the need to specifically deter this defendant from re-engaging in fraud after his custodial sentence.

## CONCLUSION

For the reasons stated above, the government recommends a sentence at the low end of the applicable guidelines range: 97 months of imprisonment with credit for the time served in U.S. and U.K. custody since the defendant's May 14, 2024 arrest. A sentence of 97 months is just and sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C.

§ 3553(a). Such a sentence would appropriately reflect the seriousness of the offense, provide deterrence to transnational criminals who seek to prey upon American citizens from locations abroad, protect vulnerable members of society, and promote respect for the law.

Dated: September 4, 2025

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

*/s/ Josh Roth*

Philip M. Toomajian
Senior Trial Attorney
Transnational Criminal Litigation Coordinator

Joshua D. Rothman
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
Court ID Nos. A5501275, A5502447
450 Fifth Street, NW
Washington, D.C.  20001
Tel. 202-880-0257
Email: Joshua.D.Rothman@usdoj.gov